U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**



**Signed November 6, 2006**                     **United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| JAMES RANDELL HUGHES, | § | CASE NO. 05-82316-SGJ-7 |
| DEBTOR. | § | |
| ———————————————— | § | |
| | § | |
| WILLIAM T. NEARY, | § | |
| UNITED STATES TRUSTEE, | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 06-3263 |
| | § | |
| JAMES RANDELL HUGHES, | § | |
| DEFENDANT. | § | |

**MEMORANDUM OPINION**

**I.**
**INTRODUCTION**

Before this court is the Adversary Complaint Objecting to Debtor's Discharge (the "Complaint") brought by the United States Trustee (the "Plaintiff" or "U.S. Trustee") and Defendant's Original Answer (the "Answer") filed by James Randell Hughes (the "Defendant" or "Debtor" or "Mr. Hughes").  This court has

jurisdiction of this matter pursuant to 28 U.S.C. §§ 1334 and 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (I). This memorandum opinion constitutes the court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014. Where appropriate, a finding of fact should be construed as a conclusion of law and vice versa.

## II.
## PROCEDURAL POSTURE

The Defendant filed his voluntary chapter 7 petition in bankruptcy on October 5, 2005, so the pre-BAPCPA[1] Bankruptcy Code provisions apply. The Complaint was filed on March 30, 2006. Defendant filed his Answer on May 2, 2006. Docket call of this adversary proceeding occurred on August 14, 2006. Trial of this matter was held on August 21, 2006.

By the Complaint, the U.S. Trustee objected to granting of the Defendant's global discharge pursuant to section 727(a)(3), on the grounds that the Defendant, without adequate justification, concealed or otherwise failed to keep, record, or preserve adequate records from which his financial condition and/or business transactions could be ascertained; pursuant to section 727(a)(4), on the grounds that the Defendant allegedly knowingly and fraudulently made false oaths or accounts with

---

[1] Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").

respect to material facts on his bankruptcy Schedules filed with this court; and pursuant to section 727(a)(5), on the grounds that the Defendant failed to tender adequate or complete explanations concerning relevant and material issues. The Defendant denies all such allegations. For the reasons set forth below, this court has determined that the Defendant's discharge should be denied pursuant to 11 U.S.C. § 727(a)(3), but not pursuant to 11 U.S.C. § 727(a)(4) or (a)(5).

<u>III.</u>
<u>FINDINGS OF FACT</u>

**A. Mr. Hughes' Individual Business Background**

Mr. Hughes has a degree in finance from the University of Oklahoma. Mr. Hughes' finance studies mainly centered on real estate topics including contracts, billing procedures, financing of properties, and related areas. Mr. Hughes also testified that he had taken one or two accounting courses and that his finance courses covered financial tools, different kinds of loans and security interests. Mr. Hughes testimony revealed that dealing in the financial world was not at all unfamiliar to him. Among other things, he owned a business in the 1980s and borrowed and repaid a lot of money in connection with that business.

Prior to filing this case, the Defendant was involved in the construction and sale of "high-end" homes. Mr. Hughes first went into the home building business with a gentleman named Gordon

Todd in 1977.[2]  Their business engaged in building homes in the
$200,000 to $300,000 range, some of them on speculation and some
custom homes in the Richardson/North Dallas area.  From 1977
through 1980, Mr. Hughes worked part-time, approximately 30 hours
per week, with Mr. Todd because he also played professional
football during that time.[3]  Mr. Hughes testified that in the
1970s, he and Mr. Todd formed Todd & Hughes, Inc. and, as the
1980s progressed, he and Mr. Todd formed a number of companies.
Mr. Hughes and Mr. Todd (and sometimes Mr. Todd's brother, Cliff
Todd) were the principal shareholders and officers and directors
of the companies formed in the 1970s and the 1980s.  These
business ventures were successful through about 1986-87.  Mr.
Hughes testified that the home building business in the mid-80s
made close to a million dollars a year, but in what he called
"the land flipping days" of 1984 through 1986, it was possible
that his companies with Mr. Todd may have made $10 to $12
million.

     In the late 1980s and early 1990s, Messrs. Hughes' and
Todd's business dealings ran into some difficulties with land
development deals.  Mr. Hughes testified that one of the
companies identified by him as Construction, Inc. had

_____

     [2]Mr. Todd was not present in the courtroom during the trial.

     [3]Mr. Hughes played professional football with the Dallas
Cowboys until 1981.

approximately $50 million in judgments against it and that Todd & Hughes, Inc. ended up with approximately $10 to $15 million in judgments against it.  These problems with his businesses had a significant personal impact on Mr. Hughes.  Mr. Hughes testified that problems with his businesses effectively ended his ability to do business because he and Mr. Todd (and sometimes Cliff Todd) had personally guaranteed most of the loans taken by their businesses.  Mr. Hughes testified that the judgments were taken against his companies and him, personally, during the late 1980s and in the 1990s.  Even prior to the judgments being taken, because his businesses were unable to make timely payments on the loans, Mr. Hughes' ability to obtain credit had been seriously damaged, and during the years between about 1987 through 1990 or 1991, he did not take a paycheck.

## B.   **The Hughes' Post-Marital Partition Agreement**

Mr. Hughes married his wife, Melanie ("Mrs. Hughes" or "Melanie Hughes"), in 1983.  At the time of their marriage, Mrs. Hughes worked at a title company and was involved with real estate leasing.  Mrs. Hughes obtained a degree in business from Southern Methodist University and has worked in the real estate business for the entire duration of her marriage to Mr. Hughes.  Mrs. Hughes was not involved in any of Mr. Hughes' business projects during the 1970s, 1980s or early 1990s, which ended in such financial devastation.  She was involved in her own real

-5-

estate projects, mainly doing office finish-outs and leases. Unlike her husband, Mrs. Hughes did not personally guarantee the loans taken by the companies controlled by Mr. Hughes and Mr. Todd.  Mrs. Hughes, therefore, did not and does not bear any personal liability on any of the judgments or loans associated with those businesses.

Because of the uncertain business climate in the late 1980s and, particularly, in connection with the Federal Deposit Insurance Corporation taking over savings and loan associations during that period (precipitating Messrs. Hughes' and Todd's business troubles and triggering their personal liabilities on their business loans), and upon the advice of an attorney named Bob Warren and Mrs. Hughes' father (who is also an attorney), Mr. and Mrs. Hughes decided to enter into a post-nuptial partition agreement.  The partition agreement was entered into, in part, so that Mrs. Hughes could earn her own income and form her own business ventures without fear that her income and business ventures would be subject to Mr. Hughes' personal guarantees in connection with his business venture of the late 1970s, the 1980s and the early 1990s.

So, on or about July 17, 1988 (approximately five years into their marriage), Mr. and Mrs. Hughes entered into a partition agreement, whereby they divided their existing property into separate property estates for each spouse, and also agreed that

-6-

all the income or property arising from the separate property
owned on the date of the agreement by either spouse, or that may
later be acquired, shall be the separate property of the owner of
the separate property that generated that income, increase,
profit or revenue. They also agreed that all salary, earnings, or
other compensation for personal services or labor received or
receivable by either of the spouses, then and in the future,
would be the separate property of the party who performed the
services or labor. The partition agreement was in effect on the
date Mr. Hughes filed bankruptcy. At Mr. Hughes' section 341
meeting, he, in response to various questions, repeatedly
referred to and relied on the separation of property interests
under the partition agreement in disclaiming and/or disavowing
any interest in or knowledge of his wife's affairs.

**C. Mrs. Hughes' Business Ventures After the Partition Agreement and the Defendant's Involvement Therewith**

    1. Todd & Hughes Building, Inc.

Also in 1988, Mrs. Hughes and Mrs. Gordon Todd started a
business with a very similar name and business purpose as Todd &
Hughes, Inc. Specifically, in 1988, Mrs. Hughes formed Todd &
Hughes *Building*, Inc. with Nancy Todd, wife of Gordon Todd. Todd
& Hughes Building, Inc. was formed to build contract homes for
people who furnished their own financing. Todd & Hughes
Building, Inc. initially had very little money and did not obtain
its first building job until the company had been in existence

-7-

for about two or two and a half years, according to Mr. Hughes. Mr. Hughes apparently did not get involved in Todd & Hughes Building, Inc. until around 1990 or 1991.

During the period between 1988, when Todd & Hughes Building, Inc. was formed, and until around 1990 or 1991, Mr. Hughes employed his time trying to save Todd & Hughes, Inc., his own business with Mr. Todd. Mr. Hughes testified that Todd & Hughes, Inc.'s credit had run out, judgments were accumulating on the business and on himself and Mr. Todd. People did not want to do business with Messrs. Hughes and Todd because of the judgments against them and because they could not hold money in an account without it being garnished to pay the judgments. Mr. Hughes testified, "So it all had to do with credit. It had to do with credit. I had no credit. Gordon had no credit. We weren't able to deal with people and hold their money, because it was subject to garnishment." Transcript page 155, lines 17 through 20. Mr. Hughes testified that the last time he did any type of work as an officer or director of a company was in the early 1990s for Todd & Hughes, Inc. and he has not operated any of his companies held with Mr. Todd since the early 1990s.

When Todd & Hughes Building, Inc. obtained its first building job, Mr. Hughes went to work for the company to coordinate sales and marketing for the company. Mr. Todd held a similar position with Todd & Hughes Building, Inc. Mr. Hughes

-8-

testified that he would work with his wife to build homes and that Mr. Todd would work with Mrs. Todd to build homes. Mr. Hughes testified that Todd & Hughes Building, Inc. did virtually the same sort of business that Todd & Hughes, Inc. did, except that Todd & Hughes Building, Inc. only built homes on contract, where as Todd & Hughes, Inc. was involved in real estate development speculation. At Todd & Hughes Building, Inc., Mr. Todd and Mr. Hughes were responsible for construction sales and Mrs. Todd and Mrs. Hughes were in charge of accounting, signing the documents, filing the paperwork, negotiating contracts, signing checks, handling real estate closings and similar sorts of responsibilities. Mrs. Hughes was also involved in decorating aspects or "finishing out" of certain of the jobs that Todd & Hughes Building, Inc. completed.

Todd & Hughes Building, Inc. operated through 2001 or 2002 doing mainly contract homes and a few speculation homes in the late 1990s. At some point, Mr. and Mrs. Todd and Mr. and Mrs. Hughes had a difference of opinion regarding how the company should be run, which led to the demise of the business. Litigation ensued among Mrs. Todd, Todd & Hughes Building, Inc., Mrs. Hughes and Mr. Hughes in a suit styled <u>Nancy Todd vs. Todd & Hughes Building, Inc., Melanie Hughes, and Randy Hughes</u>, Case No. 02-02157-C (Dallas County, 68th Judicial District). The litigation settled with the assets of the company being divided

between Mrs. Todd and Mrs. Hughes and the two parted ways.

2. H. Hughes Properties, Inc.

Shortly, thereafter, in or about 2002, Mrs. Hughes started her own company, H. Hughes Properties, Inc. ("H. Hughes Properties"), with funds provided to her by her stepfather because a restraining order prevented her from taking any funds out of Todd & Hughes Building, Inc. Mrs. Hughes is the president and sole shareholder of H. Hughes Properties and Mr. Hughes acts as a coordinator between the sales and the construction of the building jobs. H. Hughes Properties is in the business of residential remodeling and building new custom homes. Debtor does not claim a community interest in either Todd & Hughes Building, Inc. or H. Hughes Properties.

3. 4323 Beechwood Properties, LLC

There was testimony that a particular business entity, 4323 Beechwood Properties, LLC ("4323 Beechwood"), had received an assignment of such a real estate speculation contract from Todd & Hughes Building, Inc. in connection with the settlement of the Todd Litigation. 4323 Beechwood was a joint venture owned 50% by Mike Everhart and 50% by H. Hughes Properties, formed for the purposes of real estate speculation and, specifically in order to build a house in the Preston Hollow subdivision of Dallas, Texas and then sell it. Records from the Texas Secretary of State's office show that even through the present, Mr. Hughes, the

-10-

Defendant, is the President and a director of 4323 Beechwood. This entity was not disclosed in Mr. Hughes' Schedules or Statement of Financial Affairs ("SOFA"). Nevertheless, Mr. Hughes testified he had never owned any interest in 4323 Beechwood and never considered himself to be an officer or director of 4323 Beechwood, nor did he ever act as president or any other type of officer on behalf of the company. He testified that Mr. Everhart was the sole guarantor of 4323 Beechwood and that Mr. Everhart's attorney had initially drawn up the LLC paperwork showing Mr. Hughes as president. Mr. Hughes then changed that designation to that of manager, which Mr. Hughes maintains was always his only position, despite what the filings with the Secretary of State indicate. As manager, he testified that he managed the construction of the house, which involved, basically, coordinating the construction of the house. Mr. Hughes was never paid any kind of fee for being manager. He asserts that he was never aware of the public filings showing him as president of 4323 Beechwood until they were presented to him at the section 341 meeting.

**D.  Operating on a Cash Basis**

Regarding his personal finances, Mr. Hughes testified that in 1990 or 1991, he had the last $500,000 of his "Cowboy money" set aside for his retirement at Pavillion Bank, but those funds were garnished to repay the Todd & Hughes, Inc. debt. It was

these sorts of garnishments that caused Mr. Hughes to begin operating, personally, on a cash basis.  Mr. Hughes testified that he did have personal bank accounts in the 1970s and in the 1980s.  In the early 1990s, his judgment creditors began garnishing his personal bank accounts.  He testified that, in order to avoid the garnishments, he stopped putting money in the bank.  He asserted that his family needed the money too badly, that they were living "hand to mouth," and that he "couldn't stand there being any more garnishments."  Transcript page 160, lines 5 and 6.  He testified that he has been operating on a cash basis for 12 to 15 years or more.

Mr. Hughes testified that he cashes his checks at two different banks, Compass Bank and Plains Bank.  He testified that he received $2,500 twice a month from H. Hughes Properties and that half of that amount goes to pay his children's private school tuition to Hockaday Academy and Jesuit, $400 to $500 of that amount goes for his spending money, and then the balance of approximately $2,000 goes into a drawer at the Hughes home to be used for household expenses.  Mr. Hughes testified that this is how he has operated for well over a dozen years.  Mr. Hughes also testified that he sometimes holds his checks in a drawer until it is time to pay his children's tuition.  When the tuition comes due (twice a year), he takes the checks and buys a cashier's check to pay whatever part of their tuition he can pay.

-12-

Regarding the approximately $2,000 a month, or $24,000 a year, that goes into the drawer for household expenses, Mr. Hughes testified that he had no way to account for those funds other than, perhaps, grocery receipts. He testified that there are not any records, no ledger or diary or anything of that nature, that he keeps concerning the funds he receives when he negotiates his checks at the bank. He testified that the amount of money he gets is on his Forms W-2 from H. Hughes. Similarly, Mr. Hughes testified that there are not any records of the amounts Mrs. Hughes takes out of the drawer. Finally, Mr. Hughes testified that he does not keep records of how he disposes of the approximately $400 to $500 in spending money he uses a month. Regarding payments of his children's tuition, Mr. Hughes asserts that the only records of those transactions are the cashier's checks he uses to pay the tuition, copies of which he provided to the U.S. Trustee.

**E. Mr. Hughes' Income**

As set forth above, Mr. Hughes has no interest in any account in any financial institutions, and has not had such an account in over 15 years. He repeatedly testified at his creditors' meetings that upon being paid each month by his wife's company, H. Hughes Properties, he cashes those checks and places approximately $2,000.00 in cash in "a drawer" at home. He testified that this cash is a "gift" to his wife. In other

testimony, he has characterized this practice as his contribution towards the $19,060.00/month of family expenses.  He indicates he pays some expenses, including the housekeeper and pool maintenance company, from the cash in this drawer.  He testifies that there are no records of, *inter alia,* these payments from the drawer, of the amounts taken from this drawer to pay either vendors or his wife, and/or his consumption of the balance paid to him each month.  These payments were not originally disclosed on the Debtor's Schedules or SOFA.

The Debtor's original SOFA identified the Defendant's 2005 income for the period January 2005 to December 2005 as $45,000 ($4,090 a month).  The amended SOFA shows his income for the period January 2005 to December 2005 to be $83,000.  A pay statement dated October 15, 2005 shows his gross income at $69,108.60 as of October 15, 2005, or $7,274.58 monthly.

The Defendant's amended SOFA also indicates his gross income in 2004 was $100,000.00.  His 2004 Federal Income Tax Return indicates that he and his wife had $307,618.00 in wages and salaries.  The original W-2's from H. Hughes Properties attached to this return indicates the Defendant was paid $210,000.00 in 2004, and that his wife received $30,000.00.  However, amended W-2's indicate he was paid $100,000.00, and his wife was paid $140,000.00.  This is an identical $110,000.00 "swing" in their reported incomes.  When questioned about this item on the tax

-14-

return, Mr. Hughes, at the section 341 meeting and at trial,
repeatedly referred to H. Hughes Properties' accountant, Mr. John
Evans, as the party who could explain the discrepancies. He had
no sufficient explanation himself.

The accountant for H. Hughes Properties, John Evans,
testified at trial that he is a self-employed certified public
accountant and that he had prepared the company's tax returns
since 2002. He also testified that he had also been employed to
prepare the Hughes' personal joint income tax returns since 2002.
Mr. Evans testified that he did no other work for the company—
*e.g.,* he did not prepare financial statements, or anything else
of that nature for the company. He testified that an individual
employed by H. Hughes Properties, Sienne Boland, is his primary
source of information concerning the company. Mrs. Hughes, he
testified, rarely provides him the company's financial
information and Mr. Hughes never does. His main contact with Mr.
Hughes is in attempting to determine cost allocation of job costs
for H. Hughes Properties.

Regarding the Hughes' personal income tax returns, Mr. Evans
testified that he obtained the information for the returns from
Mrs. Hughes and not from Mr. Hughes. With regard to Mrs. Hughes'
income from H. Hughes Properties, Mr. Evans testified that,
consistent with the treatment of an S corporation, any income
from H. Hughes Properties would pass through to Mrs. Hughes and

would appear on her individual joint tax returns with Mr. Hughes.

Finally, Mr. Evans' testimony was illuminating with regard to the Forms W-2 upon which Mr. Hughes depends to demonstrate the amount of income he receives from year to year.  When questioned about the amount of withholding concerning Mr. Hughes' tax year 2003 Form W-2—why it was so large—Mr. Evans testified that they "had trouble tracking payroll down."  Mr. Evans went on to explain that the reason why the withholding amount on Mr. Hughes' Form W-2 was so high was to, in essence, off-set for Mrs. Hughes' pass-through income from H. Hughes Properties in order that the couple would avoid paying penalties on their joint return for failure to withhold enough tax.  With regard to tax year 2004, Mr. Evans prepared a Form W-2 showing Mr. Hughes' income to be $210,000 and then amended it to show his income to be $100,000. When asked why he amended Mr. Hughes' 2004 Form W-2, Mr. Evans testified that it was simply a clerical error on the part of his administrative assistant and that the amended form W-2 was prepared within approximately three weeks of the first one, after Mr. Hughes had brought the error to Mr. Evans' attention.

But the facts concerning the actual amount of Mr. Hughes' salary get murkier.  Mr. Evans testified that Mr. Hughes received net income of $60,000 per year.  But when questioned why Mr. Hughes' Forms W-2 might reflect more than that he testified that, in essence, if Mr. Hughes did not cash checks issued to him in

tax year A until tax year B, the amounts from those checks would
be reflected in his income in tax year B, despite the checks
having been issued in tax year A.  Mr. Evans would reconcile the
income according to what checks Mr. Hughes cashed, not in
accordance with what Mr. Hughes was paid.  On cross, Mr. Evans
testified that he prepares the company's quarterly FICA
withholding returns and that, as a result of these sort of
financial gymnastics, the company's quarterly returns have been
late and the company has been assessed penalties.  He testified
that it is the company, not his office, that cuts the checks to
pay its quarterly FICA obligations.

So although Mr. Hughes points to the Forms W-2 as one of the
only reliable means of determining how much money he was paid in
any given year, they are not so reliable; they appear to change
based upon Mr. Hughes' whims as to when he might cash his payroll
checks.  This is not in keeping with standard business and
accounting practices.  It would appear that, whether or not Mr.
Hughes cashes checks is irrelevant as to whether those funds are
income.  Accordingly, it appears to this court that Mr. Hughes
was using Mrs. Hughes' business as his personal piggy bank and
that his payroll checks were more in the nature of withdrawals
from that piggy bank than actual payroll.  This is consistent
with the need to "reconcile" payroll at the end of the year
depending upon what checks Mr. Hughes had actually chosen to cash

in any given year.

Mr. Hughes' Schedule I indicates that he earns approximately $6,900 a month as an employee of H. Hughes Properties, netting approximately $5,000 a month. And Mr. Hughes so testified that he brings home two $2,500 paychecks a month. H. Hughes Properties also provides Mr. Hughes with a company car for which the company pays for everything, including insurance and fuel. Mrs. Hughes testified that H. Hughes Properties also provides employees with a health insurance allowance, a company credit card, and a cellular telephone allowance. And although there was some personal use of such company-provided items, such personal use was not reflected on Mr. Hughes' Forms W-2 because, Mr. Evans testified, the company did not provide him with information concerning the amount of personal use. Mr. Evans testified that pay advices—Plaintiff's Exhibits 9-A, 9-B, 9-C, and 9-D—which show differing gross pay amounts for Mr. Hughes during the month of October 2004 were prepared after-the-fact, after the actual checks had been cut to the employees. So again, as a non-contemporaneous record of the amounts paid, these pay advices are of little value in showing parties-in-interest how much, exactly, Mr. Hughes was earning and taking home to put into the drawer each month. We have only the testimony of Mr. and Mrs. Hughes to guide us.

## F.  Mr. Hughes' Schedules, Statement of Financial Affairs, and the Section 341 Meeting

The Defendant's Schedule I indicates he earns approximately $6,900.00/month as an employee of H. Hughes Properties, and that his net monthly income from this is $5,000.00.  The Defendant did not schedule his wife's income on Schedule I.  In addition to her employment by H. Hughes Properties, she is employed by Bradford Realty Services.

The Defendant's original Schedule J indicated he had $13,445.00 in monthly expenses.  On January 12, 2006, after he learned his case was being investigated by the U.S. Trustee, he amended Schedule J.  This amendment caused the following items to be changed:

|  | Originally Scheduled As | Scheduled - as Amended |
|---|---|---|
| a: | Telephone $205; Cell $300 | Telephone $350 |
| b: | Home maintenance $500 | Home maintenance $370 |
| c: | Clothing $400 | Clothing $1,400 |
| d: | Laundry $400 | Laundry $330 |
| e. | Medical & dental $400 | Medical & Dental $300 |
| f. | Recreation $250 | Recreation $240 |
| g. | Charitable contribs. $1,000 | Charitable contribs. $1,200 |
| h. | Health insurance $0.00 | Health insurance $140 |
| I. | Education children $2,900 | Education children $4,300 |
| j. | Payments for others $700 | Payments for others $1,100 |
| k. | Maid services (not listed) | Maid services $2,850 |

According to the amendment, the Debtor incurs $19,060.00 in expenses/month (the above chart simply reflects the amended items on Schedule J and not all expenses listed on Schedule J).

The Defendant has repeatedly testified that his wife handles all the family expenses, that he has no knowledge about those

-19-

affairs, that his completion of Schedule J was based upon information he got from her, and that he has no knowledge of the veracity of those expenses. He did nothing to independently verify this information before filing either the original or amended Schedules I and J. Mr. Hughes also testified that the family pays for maid service, pool service, yard service, as well as other types of household maintenance and service type contractors, some of which were paid from the funds in the money drawer at home, but he has no record of this. It is not incredible to believe that one member of a household would be responsible for paying the bills—indeed, such divisions of labor between spouses or domestic partners are quite common—so the fact that Mr. Hughes was not certain about the exact amounts of household expenses does not strain credibility. But it would have behooved Mr. Hughes to attempt to educate himself of such amounts, as they were included in his bankruptcy Schedules, which were signed by him under penalty of perjury.

Next, the U.S. Trustee makes much of several discrepancies between the Debtor's first set of Schedules and his amended Schedules and/or the fact that the Debtor did not list certain items on his Schedules. For instance, according to his Schedules, the Defendant's business activities culminated in his owing $41,808,513 in unsecured obligations to 11 creditors. The Defendant did not schedule the dates these debts were incurred.

-20-

This information is required by the Schedules.  Though most of the aforementioned debt clearly pertains to his business activities, the Defendant's Petition identified the debt as being primarily consumer debt.  The U.S. Trustee next notes that on April 29, 2005, the Defendant purchased a $7,500.00 cashier's check from Compass Bank.  This check was used to pay tuition for the Defendant's children at Jesuit Preparatory School.  This transfer was not originally disclosed on the Debtor's Schedules or SOFA.

The U.S. Trustee also points to the Hughes' 2004 joint tax return which also shows $754,754.00 in other income, which, according to the return, is partially attributable to the sale of 500 shares of Todd & Hughes Building stock on December 31, 2004, and from an unidentified source which the Defendant reported on Schedule E of the return.  The income from this unidentified source may, according to Form 6198 of the return, have been H. Hughes Properties. The Debtor could not explain any meaningful details about this income.  When asked about them at the section 341 creditors' meetings, the Debtor could not explain any details concerning Cerebis, LLC and ODIN Millemium (sic) Partnership LTD., both of which are entities appearing on the Defendant's 2004 joint tax return.

When asked about these entities the Defendant again disavowed knowledge of them and claimed they were exclusively

-21-

part of his wife's affairs. However, his wife testified in deposition that Cerebis was a company she used to work for and bought stock in, and that the Defendant was aware of (a) the name of that company, (b) that she bought stock in that company, and (c) ultimately incurred a loss from the sale of that stock. She also testified that the Debtor and Mr. Todd were the ones that brought Odin Mellenium to them as an investment potential. The U.S. Trustee sees obfuscation in Mr. Hughes' failure to recall details about his wife's business dealings, but it does not strain credibility that if he were really not all that involved in these enterprises, he would not have a clear memory of them, now some two years hence. Mrs. Hughes' clearer memory of these transactions is evidence that, indeed, she was more heavily involved in these enterprises.

The U.S. Trustee also points out that Mr. Hughes filed a joint tax return with his wife in 2003 and 2004. He signed both tax returns and both were filed with the Internal Revenue Service. The Debtor took approximately $24,000.00 in charitable deductions for tax year 2004, consisting primarily of contributions to his church. As the result of these deductions, the Debtor's income tax liability for his salary as an employee of H. Hughes Properties, Inc. was reduced. Yet no contributions or transfers to the church are listed on the Debtor's Schedules or SOFA. The evidence, however, shows that checks to Prestonwood

Baptist Church were written on Mrs. Hughes' checking account and the testimony at trial of both husband and wife is that those funds given to the church were Mrs. Hughes' separate property. It is perfectly proper for a married couple, even with separate property estates, to file a joint return and it is also perfectly proper for Mrs. Hughes to take advantage of her charitable deduction of the gifts she made to the church.

Next, the U.S. Trustee highlights that Todd & Hughes Construction Co. is still reflected as the owner of certain real estate.  The Texas Secretary of State indicates that Todd & Hughes Construction Company forfeited its corporate charter and lost its status as a corporation some time ago.  As a result, Mr. Hughes is the owner of a beneficial interest in whatever assets that company owned.  He only scheduled his interest in "Construction, Inc."  He did not schedule any interest in Todd & Hughes Construction Co., Inc. or other such entity.

Finally, the U.S. Trustee points out that Mr. Hughes failed to disclose any interest in his NFL retirement account on his original Schedules, and that Mr. Hughes signed a document under auspices suggesting he was the managing partner of an entity identified as Allegro Management, but did not disclose any interest in or position with Allegro Management in his Schedules or SOFA.

With regard to many of these issues, Mr. Hughes explains

-23-

that the mistakes were oversights, harmless mistakes made in the haste to get his bankruptcy petition filed as soon as possible, having been precipitated by a judgment creditor attempting to revive what Mr. Hughes described as a dormant judgment. Mr. Hughes credibly testified that he did not intend to deceive anyone, but made some simple errors, which he attempted to correct on his amended Schedules and SOFAs. The U.S. Trustee, depending largely upon an unpublished opinion arising from the Fort Worth Division of this court and a Fifth Circuit opinion given no precedential value by the Fifth Circuit, argues that if you count up these errors, it is enough to show Mr. Hughes' intent to deceive.

## IV.
## CONCLUSIONS OF LAW

Based upon the foregoing facts, this court must determine whether Mr. Hughes' discharge should be denied pursuant to sections 727(a)(3), (a)(4), and/or (a)(5) of the Bankruptcy Code. The court starts by noting that objections to discharge should be narrowly construed in furtherance of the policy of a fresh start for the debtor, but the purpose of provisions like section 727 is to ensure that those who seek bankruptcy protection "do not play fast and loose with their assets or with the reality of their affairs." *Razzaboni v. Schifano (In re Schifano)*, 378 F.3d 60, 66 (1st Cir. 2004).

-24-

**A. Has Mr. Hughes failed to keep and preserve financial records, without adequate justification for that failure, sufficient to allow creditors to examine his financial condition such that his discharge should be denied pursuant to section 727(a)(3)?**

Section 727(a)(3) of the Bankruptcy Code provides that "[t]he court shall grant the debtor a discharge, unless the debtor has concealed, destroyed, mutilated, falsified, or *failed to keep or preserve any recorded information*, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C. § 727(a)(3)(emphasis added). It is the last portion of Section 727(a)(3)—the failure to keep records language—that appears to be implicated in the case at bar.

1. The Legal Standards for Establishing "Failure to Keep Records" Under Section 727(a)(3).

"In order to state a prima facie case under [section] 727(a)(3), the party objecting to discharge bears the initial burden to prove (1) that the debtors failed to keep and preserve their financial records and (2) that this failure prevented the party from ascertaining the debtors' financial condition. Though a debtor's financial records need not contain 'full detail,' 'there should be written evidence' of the debtor's financial condition." *Martin Marietta Materials Southwest, Inc. v. Lee (In*

*re Lee)*, 309 B.R. 468, 476 (Bankr. W.D. Tex. 2004) (Clark, J.)
(*citing Robertson v. Dennis (In re Dennis)*, 330 F.2d 696 (5th
Cir. 2003); *Goff v. Russell Co. (In re Goff)*, 495 F.2d 199 (5th
Cir. 1974)). If the plaintiff meets its burden to make that
prima facie case, the burden shifts to the debtor to show that
the failure to keep adequate records was justified under all of
the circumstances. *Id.*

Section 727(a)(3) is not a prescription of a "rigid standard
of perfection" in record-keeping, but requires that the debtor
"present sufficient written evidence which will enable his
creditors reasonably to ascertain his present financial condition
and to follow his business transactions for a reasonable period
in the past." *First Nat'l Bank of Claude, Texas v. Williams (In
re Williams)*, 62 B.R. 590, 593 (Bankr. N.D. Tex. 1986) (Akard,
J.) (analogizing section 727(a)(3) to section 14(c)(2) of the old
Bankruptcy Act). "It is a question in each instance of
reasonableness in the particular circumstances. Complete
disclosure is in every case a condition precedent to the granting
of the discharge, and if such a disclosure is not possible
without the keeping of books or records, then the absence" of
books and records amounts to the failure described in section
727(a)(3). *Id.* The books and records need not be perfect but
they should sufficiently identify transactions so that an
intelligent inquiry can be made of the transactions. *Alten*, 958

-26-

F.2d at 1230.  "The test is whether 'there [is] available written evidence made and preserved from which the present financial condition of the [debtor], and his business transactions for a reasonable period in the past may be ascertained.'" *Id.* (*citing In re Decker*, 595 F.2d 185 (3rd Cir. 1979)).  "The debtors records must at least reasonably allow for reconstruction of the debtor's financial condition to meet the requirements of the Code."  *In re Lee*, 309 B.R. at 478.  There is no affirmative duty to, specifically, maintain a bank account, but the records must sufficiently identify the debtor's financial transactions so that an intelligent inquiry can be made of them.  *Ivey v. Anderson (In re Anderson)*, 2006 WL 995856, *3 (Bankr. M.D.N.C. 2006).

Section 727(a)(3) places an affirmative duty on the debtor to provide books and records "accurately documenting his financial affairs."  *Structured Asset Services, L.L.C. v. Self (In re Self)*, 325 B.R. 224, 241 (Bankr. N.D. Ill. 2005).  "[C]reditors are not required to accept a debtor's oral recitations or recollections of his transactions; rather, to qualify for a discharge in bankruptcy, a debtor is required to keep and produce written documentation of all such transactions." *Id.*  Records are not adequate if they do not provide enough information for the creditors or the trustee to ascertain the debtor's financial condition or to track his financial dealings with substantial completeness and accuracy for a reasonable

period into the past. *Id*. "The completeness and accuracy of a debtor's records are to be determined on a case-by-case basis, considering the size and complexity of the debtor's financial situation." *Id*. The court has broad discretion in determining the sufficiency of the records provided and considerations for the court in making such a determination include the debtor's sophistication, educational background, business experience, business acumen, and personal financial structure. *Id.; see also In re Lee*, 309 B.R. 468 (noting that the bankruptcy court has wide discretion in determining whether the party objecting to discharge has met its prima facie burden and whether the debtors have justified their failure).

If the debtor fails to maintain and preserve adequate records, the debtor must present some justification for that failure. *Meridian Bank v. Alten*, 958 F.2d 1226, 1230-31 (3rd Cir. 1992)("*Alten*"). "Depending upon the sophistication of the debtor and the extent of his activities, different record keeping practices are necessary." *Id*. at 1232. Where the debtor was an attorney, a "knowledgeable business and professional person who knew the value of maintaining adequate records," who had "generated substantial revenue and traveled extensively throughout the world, and was in the international investment and real estate consulting business for many years preceding" the bankrupt was held to a higher standard. *Id*. at 1231. In the

*Alten* case, the debtor provided business and personal financial records for a four year period consisting only of three handwritten sheets of paper purporting to show income of approximately $380,000, a handwritten ledger showing dates and travel destinations, and income tax returns lacking supporting documentation for $120,000 in business expense deductions. *Id*. at 1228.

2. Policy and Purpose Underlying the Record Keeping Requirement of Section 727(a)(3).

"The purpose of section 727(a)(3) is to give creditors and the bankruptcy court complete and accurate information concerning the status of the debtor's affairs and to test the completeness of the disclosure requisite to a discharge. The statute also ensures that the trustee and creditors are supplied with dependable information on which they can rely in tracing the debtor's financial history. Creditors are not required to risk having the debtor withhold or conceal assets 'under cover of a chaotic or incomplete set of books or records.'" *Alten*, 958 F.2d at 1230 (*citing In re Cox*, 904 F.2d 1399 (9th Cir. 1990)).

"Section 727(a)(3) is intended to allow creditors and/or the trustee to examine the debtor's financial condition and determine what has passed through a debtor's hands. *** The creditors are entitled to written evidence of the debtor's financial situation and past transactions. Maintenance of records is a prerequisite to granting a discharge in bankruptcy. *** Unless the debtor

-29-

justifies his failure to keep records, a discharge should not be granted." *In re Grisham*, 245 B.R. 65, 77 (Bankr. N.D. Tex. 2000) (internal citations omitted).  Section 727(a)(3) places the initial burden on the party objecting to the discharge to show that the debtor has failed to keep and maintain records sufficient for the creditors to ascertain the debtor's financial condition.  The burden then shifts to the debtor to show that his failure was justified.  *In re Guenther*, 333 B.R. 759, 765 (Bankr. N.D. Tex. 2005).  The debtor's duty under section 727(a)(3) is to take reasonable precautions to preserve his records, and although the debtor's financial records need not be perfect, they must provide some evidence of the debtor's financial condition.  *Id.* "Often Debtors are poor record keepers, and the law does not require an impeccable system of bookkeeping.  But by the same token, creditors should not be required to speculate about the financial condition of the debtor or hunt for the debtor's financial information.  If the creditor's initial burden is satisfied, the burden shifts to the debtor to prove that the inadequacy is justified based on the totality of circumstances including what a reasonable person would do in similar circumstances." *Id.* (internal citations omitted).  The objecting party "need not prove a fraudulent intent [with regard to a failure to keep and preserve records], but only that the debtor unreasonably failed to maintain sufficient records to adequately

ascertain his financial situation." *In re Schifano*, 378 F.3d at 70; *see also Ivey v. Anderson (In re Anderson)*, 2006 WL 995856, *3 (Bankr. M.D.N.C. 2006).

  3. Application of the Law to the Facts at Bar.

  Mr. Hughes candidly admitted to this court that he keeps no record of his financial transactions. He keeps no bank account which would reflect his receipts and expenditures. He does not keep receipts of his day to day expenditures of his pocket money. He does not keep a ledger of the amounts of money that go into and out of the drawer at home in which he places thousands of dollars a year. There is simply no way to track those funds other than, Mr. Hughes testified, with: (a) the grocery receipts that were turned over to the U.S. Trustee; and (b) the cashier's checks he has used when he paid his children's private school tuition. Mr. Hughes testified that his W-2's at least show how much income he has made but, as set forth above, these are of questionable reliability. The bottom line is that there are no records to show precisely how much cash (*i.e.,* potential future property of the estate) went in and out from the Debtor's dominion and control in the months leading up to the bankruptcy case. Practically, the only financial records turned over by Mr. Hughes were his joint tax returns with Mrs. Hughes.

  Mr. Hughes' justification for why he kept no bank accounts is to avoid having his money garnished by the FDIC in

satisfaction of the judgment liens held against Mr. Hughes in connection with his failed businesses. Mr. Hughes further argues that he has turned over everything he has in the way of financial documents. He asserts that he has not failed to preserve financial documents because, since there were never any such documents (like checking account records or a ledger of the funds in the drawer at home), he could not possibly have failed to preserve them. But this argument ignores the requirement to *keep* such records too, and Mr. Hughes has not provided sufficient justification for failure to keep those records in the first place.

It has been said many times that receiving a discharge in bankruptcy is a privilege, not a right. In order to have entitlement to that privilege, certain basic financial record keeping by the debtor is of paramount importance. Record keeping is required for parties in interest to be able to verify the accuracy of the sworn Schedules and SOFAs and to be certain that the disclosures are materially accurate. If there are insufficient records, then there is no way to have a check on the integrity of the Schedules and SOFAs. The integrity of the bankruptcy process depends upon having some reasonable and reliable paper trail. The regrettable consequence of failure to have adequate records must be the denial of a discharge.

In the *Alten* case, "[t]he [debtors] openly acknowledge their

intent to transact business solely in cash in order to avoid
creditors levying on their assets. In order to deny discharge
for failure to keep records the court need not find that the
debtor intended to conceal his financial condition," but need
only show that "the debtor has unjustifiably failed to keep
records of his financial condition." *Id*. at 1234. "Fear of
liens by creditors can never by itself constitute adequate
justification for failing to candidly disclose the financial
status of a debtor." *Id.* In the *Alten* case, the bankruptcy
court did not find that the debtors destroyed, concealed,
mutilated or falsified records, but found only that they failed
to keep complete records and information and the district court
found and the Third Circuit affirmed that such failure, not
sufficiently justified by the debtors, formed grounds to deny the
discharge. *Id*. at 1234. The court in *Jacobwitz v. The Cadle
Company (In re Jacobwitz)*, 309 B.R. 429 (S.D.N.Y. 2004) found as
insufficient justification for failure to maintain records the
debtor's assertion that he lived an essentially paperless
lifestyle where it was also the debtor's practice to discard
receipts and bills pertaining to his business expenses soon after
receipt. *Id*. at 439.

Similarly to the debtors in *Alten* and *Jacobwitz*, Mr. Hughes'
explanation for why he failed to keep and maintain financial
records is not sufficiently justified. As stated in *Alten*, fear

of judgment liens is not by itself sufficient justification for failing to keep financial records. Even if Mr. Hughes was attempting to avoid the effects of judgment liens by avoiding to keep a bank account, in favor of a drawer in his house, this does not explain why Mr. Hughes did not keep a simple ledger of the funds deposited into that drawer and withdrawn from that drawer. Mr. Hughes testified that the funds in the drawer were used for household expenses. It would have been very easy for Mr. Hughes to go to the local dime store and purchase a ledger, and record deposits of funds into the drawer and withdrawals of funds from the drawer. Mr. Hughes is a well-educated man, holding a degree in finance from a well-respected university. He is a sophisticated business man, having dealt in multi-million dollar transactions for many, many years. As such, Mr. Hughes is held to a higher record-keeping standard than one not so financially savvy. Failure to justify why he did not track the receipt and expenditure of literally thousands of dollars each month is not justified. His oral testimony of how the funds were spent is not sufficient.

Mr. Hughes points to his Forms W-2 as evidence of the amount of income he received from year to year. However, the testimony of Mr. Evans, the accountant for Mrs. Hughes' business, demonstrates that the Forms W-2 are, at best, an estimate of the amount of funds Mr. Hughes received in connection with his work

for H. Hughes Properties. It appears to the court that Mr. Hughes used H. Hughes Properties as his personal piggy bank, running certain personal expenses through the company and taking funds from the company when it suited him to do so (by way of cashing his payroll checks or omitting to cash them as he saw fit). However, even if the Forms W-2 were 100% reliable, they are not sufficient documentation of receipt and expenditures of property of the Debtor. For all of these reasons, the U.S. Trustee's objection to Mr. Hughes's discharge pursuant to section 727(a)(3) is sustained.

**B.  Has Mr. Hughes knowingly and fraudulently made a false oath or account in connection with his bankruptcy case such that his discharge should be denied pursuant to Section 727(a)(4)?**

1.  The Legal Standard for False Oaths or Accounts Under Section 727(a)(4)

Section 727(a)(4) provides that "[t]he court shall grant the debtor a discharge unless the debtor knowingly and fraudulently, in or in connection with the case (A) made a false oath or account; (B) presented or used a false claim; (c) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs."

In order to make a showing under 727(a)(4)(A), the plaintiff

-35-

must show (1) that the debtor made a statement under oath; (2) that the statement was false; (3) that the debtor knew the statement was false; (4) that the debtor made the statement with fraudulent intent; and (5) that the statement related to materiality to the bankruptcy case. *Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 177-78 (5th Cir. 1992); *Soldra v. Chilmark Financial LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001). False oaths sufficient to justify the denial of discharge include a false statement or omission in the debtor's schedules or a false statement by the debtor at the examination during the course of the proceedings. *In re Beaubouef*, 966 F.2d at 178. Specifically, the debtor's failure to list his involvement with and interest in corporate entities was a material omission. *Id.* The Fifth Circuit further opined that "the existence of more than one falsehood, together with [the debtor's] failure to take advantage of the opportunity to clear up all inconsistencies and omissions when he filed his amended schedules, constituted reckless indifference to the truth and, therefore, the requisite intent to deceive." *Id.* Even failure to list ownership interest in an entity because that interest was "worthless," was a material omission. The Fifth Circuit noted that whether an omission is material is not a question of value or whether the omission was detrimental to creditors, but a question of whether the subject matter of a false oath bears a

-36-

relationship to the debtor's business transactions or estate, or concerning the discovery of assets, business dealings, or the existence and disposition of his property." *Id*.

With regard to amendments to schedules, amendments will "not negate the fact that [the debtor] made knowingly false oaths in his original schedules and statement of financial affairs." *In re Soldra*, 249 F.3d at 382.  This is even more true when the debtor files those amendments only after the falsity of the original schedules and SOFAS was revealed.  *Id.*

    2.  Applicability of the Law to the Facts at Bar.

        A.  The Debtor's Schedules.

The U.S. Trustee places great weight on the Fifth Circuit opinion, *The Cadle Company v. Mitchell (In re Mitchell)*, 102 Fed. Appx. 806 (5th Cir. 2004), in which the Fifth Circuit affirmed the grant of summary judgement to The Cadle Company on a section 727(a)(4) action where the lower court, the district court, basically counted the number of errors in the debtor's statements and schedules and then found the knowing and fraudulent making of a false oath.  The *Mitchell* case, however, is headed with a notation that the case was not selected for publication by the Fifth Circuit, according it no precedential value.  Accordingly, this court will look to the case for instruction, but does not feel bound by the holding in *Mitchell*.  Similarly, with regard to the unpublished opinion from this district's Fort Worth division,

this court will view it as instructive, but not binding with regard to section 727(a)(4).

At any rate, in *Mitchell*, the Fifth Circuit upheld the district court's grant of summary judgment where the debtors had made the following errors and omissions in their bankruptcy filings: "(1) they provided only half a month's income in response to a question that demanded a full month's income; (2) they initially listed a life insurance policy as having no cash value and a face value of $15,000, though it actually had a cash value of approximately $3,500 and a face value of $100,000; (3) they omitted multiple payments made to creditors within 90 days of bankruptcy; (4) in their initial filing, they did not list a counterclaim against Cadle as an asset even though they listed Cadle's claim against them as a liability; (5) they failed to list Mr. Mitchell's substantial vintage-care refurbishing tools in their initial schedules, and their final amended schedules did not include all of the tools and undervalued the remainder; and (6) they omitted a set of Wedgewood china." *In re Mitchell*, 102 Fed. Appx. at 862.  The Fifth Circuit, disagreeing with the bankruptcy court, found that "[f]raudulent intent may be proved by showing either actual intent to deceive or a reckless indifference for the truth." *Id*.  The Fifth Circuit found that the debtors demonstrated a reckless indifference for the truth in omitting these items from their bankruptcy filings.  "The

[debtors] had numerous errors and omission in their original schedules; they did not amend their schedules to correct several of those errors or omission; and their only excuse was that they filled out the forms in great haste and did not bother going over forms prepared by their attorney to make sure they were accurate. That is the essence of a reckless disregard for the truth." *Id*. at 862-63.  The availability of correct information elsewhere in the petition did not cure the undervaluation of their monthly income or the omission of the counterclaim because the debtors had "a duty to answer each question truthfully, so a false answer to one question cannot be cured by providing true information in response to another question." *Id*. at 863.

In a post-*Mitchell* case, *The Cadle Company v. Geunther (In re Geunther)*, 333 B.R. 759 (Bankr. N.D. Tex. 2005), another judge (Judge Harlin D. Hale) in this district's Dallas division, has noted that "[i]t may be close to impossible to produce Schedules and SOFAs that contain no mistaken information, and bankruptcy papers with mistakes are not, alone, enough to bar a debtor's discharge." *Id*. at 767-68.  "[T]he appropriate response is to offer amended information in a prompt fashion, and not to wait to amend the errors only after the insistence of one of their creditors." *Id*. at 768.  In the *Geunther* case, the court found that the debtors' extended delay of over four months in amending their Schedules and SOFAs added to a pattern of withholding

-39-

information and fraudulent intent (the debtors had thwarted the discovery and disclosure process at every turn and had generally been recalcitrant or slow in providing information). *Id*. Regarding materiality, Judge Hale wrote that "a false oath is 'material' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transaction or estate, or the existence and disposition of his property." *Id*. (citing *Beaubouef*, and citing *In re Pratt*, 411 F.3d 561 (5th Cir. 2005)). Finally, Judge Hale opined that "[d]ebtors who make more than one false statement under oath with an opportunity to clear up the inconsistencies have demonstrated recklessness, which is sufficient for the bankruptcy court to infer the requisite intent." *Id*. at 767.

This court finds the *Guenther* case persuasive. This court is unconvinced that, in effect, a threshold magic number of errors made by a debtor on his or her schedules is, *de facto*, the knowing and fraudulent making of a false oath or account. If the debtor makes an honest effort to clear up honestly made mistakes, such efforts should not be ignored in favor of focusing on the first, ugly error(s). Mr. Hughes did make an effort to amend his Schedules and such amendments have been accepted by this court.

　　　　B.　The Debtor's False or Incomplete Oral Accounts.

More significant and disturbing to this court is Mr. Hughes' seeming inability to answer questions regarding various matters

set forth in his Schedules, including but not limited to matters regarding personal and household expenditures. As this court previously noted, it is not beyond the pale that one spouse be tasked with the responsibility to pay family expenses, but Mr. Hughes should have made an effort to better educate himself with regard to these matters—at least before swearing under oath to such matters. The court once again notes that, if there were written financial records, the parties and court would not have been in the position of having to press for so many answers to financial questions. Still, this court sees no fraud in Mr. Hughes' oral accounts with regard to his affairs, nor does this court see any particular reckless disregard for the truth. When confronted with discrepancies, Mr. Hughes made an attempt to answer when he had the knowledge to do so, or provided the U.S. Trustee with information on how to obtain the answer—largely by referring them to Mrs. Hughes, whom the U.S. Trustee deposed, and to Mr. John Evans, H. Hughes Properties accountant, whom the U.S. Trustee did not depose. Accordingly, although Mr. Hughes' lack of knowledge about certain matters concerns this court, because he made attempts to clear up inconsistencies either by answering himself or by referring the U.S. Trustee to parties with more superior knowledge, the U.S. Trustee's objection to Mr. Hughes's discharge pursuant to section 727(a)(4) is overruled.

**C.** **Has Mr. Hughes failed to explain satisfactorily, before determination of denial of discharge, any loss of assets or deficiency of assets to meet the debtor's liabilities?**

    1.  The Legal Standard for Section 727(a)(5)

    Section 727(a)(5) provides that this court "shall grant the debtor a discharge, unless, the debtor has failed to explain satisfactorily, before determination of denial of discharge under [section 727(a)], any loss of assets or deficiency of assets to meet the debtor's liabilities." The plaintiff must make a prima facie showing that the defendant has had a sudden and drastic loss of assets just prior to filing bankruptcy, and upon that showing, the defendant bears the burden to explain satisfactorily any loss of assets. *In re Horridge*, 127 B.R. 798, 799 (S.D. Tex. 1991); *In re Reed*, 700 F.2d 986, 992 (5th Cir. 1983).

    2.  Application of the Law to the Facts at Bar.

    Mr. Hughes explains his loss and/or deficiency of assets very simply. His businesses, loans for which he had issued personal guarantees, failed—saddling him with crippling debt. He and Mrs. Hughes thereafter, in the interest of allowing her to earn a living free from Mr. Hughes' financial problems, entered into a partition agreement creating separate property estates. The U.S. Trustee has attempted to demonstrate some sort of interest in Mrs. Hughes' businesses and business dealing on the part of Mr. Hughes by some veil piercing theory, but this court is not completely convinced. The U.S. Trustee, in pointing up

-42-

the similarity of Mrs. Hughes' business ventures to Mr. Hughes' failed enterprises, creates smoke, but not an outright fire.  Mr. and Mrs. Hughes credibly testified that Mrs. Hughes, in her own right, was a business person—in fact, a real estate professional—for the entire period of their marriage prior to the creation of her first business with Nancy Todd in 1988.  It does not strain credibility to suggest that Mrs. Hughes decided to take advantage of her husband's expertise in the home construction field and create her own business in which she would employ Mr. Hughes in order to tap his practical knowledge of the industry.  Moreover, Mrs. Hughes testified knowledgeably and credibly about both her business enterprise with Mrs. Todd, about her other business activities (such as Odin Mellenium and Cerebis), and about the business operations of H. Hughes Properties.  It is obvious to the court that Mrs. Hughes is not merely a front for Mr. Hughes' business enterprises.  She is an active participant in the businesses she owns and, pursuant to the partition agreement, her ownership interest is not his ownership interest.  Accordingly, Mr. Hughes' explanation of the deficiency in his assets is sufficient and the U.S. Trustee's objection to Mr. Hughes' discharge pursuant to section 727(a)(5) will be overruled.

V.
CONCLUSION

Based upon the foregoing, judgment is for the Plaintiff in

-43-

respect of the Section 727(a)(3) cause of action only, and a judgment will be entered consistent with this opinion.

###END OF MEMORANDUM OPINION###